TRIBUNAL DE APELACIONES
Panel Especial

| | | |
|---|---|---|
| PEDRO DUARTE ROSARIO<br>Apelado<br><br>v.<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO y OTROS<br>Apelante | KLAN202400377<br><br>cons. con<br><br>KLAN202400378 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de San Juan<br><br>Caso Núm. SJ2019CV07264<br><br>Sobre:<br>Daños y Perjuicios |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Adames Soto y la Jueza Aldebol Mora[1]

Adames Soto, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 30 de julio de 2025.

Comparece el Gobierno de Puerto Rico (el Gobierno) a través de la Oficina del Procurador General de Puerto Rico, mediante el recurso de apelación identificado con el alfanumérico KLAN202400377, en representación de las Sras. Raquel Nieves González (señora Nieves González) y Ana Nieves Franco (señora Nieves Franco), (en conjunto, agentes-apelantes), funcionarias del Departamento de Hacienda de Puerto Rico. A su vez, comparece el Departamento de Hacienda de Puerto Rico (Dpto. de Hacienda), igualmente representado por la Oficina del Procurador General de Puerto Rico, mediante un segundo recurso de apelación identificado con el alfanumérico KLAN202400378.[2] En ambos recursos se solicita la revocación de la *Sentencia* emitida el 15 de diciembre de 2023 por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI o foro primario). Mediante el referido dictamen, el foro primario declaró *Ha Lugar*

---

[1] Mediante Orden Administrativa OATA-2025-070 se designó a la Hon. Waleska I. Aldebol Mora como integrante del Panel, debido a que el Hon. Abelardo Bermúdez Torres dejó de ejercer funciones como Juez del Tribunal de Apelaciones el 6 de mayo de 2025.
[2] Ordenamos la consolidación de KLAN202400377 y KLAN202400378 mediante *Resolución* de 18 de abril de 2024.

la *Demanda* sobre daños y perjuicios presentada por el señor Pedro Duarte Rosario (señor Duarte Rosario o parte apelada), y condenó a las apelantes y al Dpto. de Hacienda, al pago solidario de $60,000, más costas y honorarios de abogados.

## I. Resumen del tracto procesal

El 16 de julio de 2019, el señor Duarte Rosario presentó la *Demanda* objeto del presente pleito. En ella relató que era un pequeño comerciante nacido en la República Dominicana, y que, para el 2015, operaba un carrito de *hot dogs* localizado en la Avenida Juan Ponce de León en Santurce. Alegó que dicho negocio era partícipe del programa IVU-LOTO del Dpto. de Hacienda desde el 5 de mayo de 2011, por lo que tenía asignado una máquina, denominada terminal, mediante la cual se registraban las ventas, produciendo un recibo de compra para el consumidor. Alegó que el referido terminal se dañó en marzo de 2015 pues, aunque registraba la transacción de compraventa, no producía el correspondiente recibo. Ante esto, el apelado llamó ese mismo mes a la compañía Evertec, representante autorizado del Dpto. de Hacienda, para reportar el problema, y se le proveyó el número de querella 206-6339.

Transcurridos varios meses sin que fuera atendida su querella, el apelado se comunicó nuevamente con Evertec el 1 de julio de 2015, y recibió un segundo número de querella, 219-9780. Posterior a la presentación de esta segunda querella, acudió en numerosas ocasiones al Dpto. de Hacienda para lograr resolver su problema, y no fue hasta su sexta visita que fue dirigido a un empleado llamado Jorge Jiménez, quien le entregó un papel a manuscrito, evidenciando que la función de imprimir de su terminal se encontraba inoperante. Señaló que, durante el periodo de marzo a octubre del 2015, realizó más de cincuenta llamadas al Dpto. de Hacienda para el mismo propósito, sin que su problema fuera resuelto, aunque continuó cobrando el impuesto de venta correspondiente.

El señor Duarte Rosario sostuvo que el 8 de octubre de 2015, la señora Nieves González, agente adscrita al Negociado de Impuesto al Consumo (NIC) del Dpto. de Hacienda, se presentó a su carrito y ordenó un *hot dog* y un refresco. Antes de pagar por estos, le inquirió al apelado si estaba cobrando el IVU-LOTO, y le requirió el recibo. El señor Duarte Rosario le afirmó a la señora Nieves González que estaba cumpliendo su responsabilidad tributaria, pero que el terminal estaba dañado y no podía proveerle un recibo. Alega el señor Duarte Rosario, que, en respuesta, la señora Nieves González se negó a pagarle, *hasta que se le proveyera un recibo*. Ante esto, el señor Duarte Rosario afirmó que le mostró las gestiones que realizó para lograr resolver el problema, pero la apelante se mantuvo firme en su postura. Según alega el apelado, cuando la señora Nieves González finalmente pagó, le expresó que lo iba a "joder, porque los dominicanos lo que vienen es a robar".

El 13 de octubre de 2015, el señor Duarte Rosario nuevamente regresó al Dpto. de Hacienda a intentar resolver la situación del terminal, pero su diligencia resultó infructuosa. Al siguiente día, el apelado recibió una visita oficial de los siguientes agentes del NIC: señoras Nieves Franco y Nieves González, además del señor Ramón Maldonado Torres.

La parte apelada indicó que, finalizada la inspección que realizaron dichos agentes, estos le entregaron un formulario denominado *Inspección de Localidad, Negocio de Impuesto al Consumo* al igual que una *Citación Oficial para Recoger Terminal Fiscal IVU LOTO*. Añadió que, inmediatamente concluyó tal intervención "la codemandada Raquel Nieves González, en tono ofensivo y despectivo, volvió a repetirle que lo iba a 'joder', según se lo había prometido, y que en dos días le llegaría una carta del Departamento de Hacienda". El señor Duarte Rosario alegó que en el documento de inspección se anotó que el terminal estaba completamente descargado y que, aunque informó que estaba dañado, no pudo proveer un número de incidente. La parte apelada negó por completo lo escrito en dicho

documento pues, era su postura, que le compartió a los agentes los números de querella y los documentos que había entregado en el Dpto. de Hacienda, pero estos le indicaron "en tono abusivo, arrogante y amenazante", que la información no era válida y lo obligaron a firmarlo.

Transcurridos tres días de lo descrito, el 17 de octubre de 2015, el Departamento de Hacienda le notificó al señor Duarte Rosario dos multas, por sendas infracciones a la sec. 6043.06 (c) del Código de Rentas Internas, 13 LPRA sec. 33166, de $20,000 cada una.

En consecuencia, el 23 de octubre de 2015, el señor Duarte Rosario presentó una querella ante el Dpto. de Hacienda impugnando dichas multas. En la misiva, indicó que cuando atendió a las funcionarias del NIC, les había notificado que el terminal estaba dañado y les mostró las gestiones realizadas al respecto, que incluían llamadas y visitas al Dpto. de Hacienda, donde un técnico le comunicó que la máquina necesitaba ser reemplazada, pero que al momento no tenían reemplazos disponibles.

A causa de la inacción del Dpto. de Hacienda en atender su querella, a pesar de todas las gestiones realizadas, el 16 de marzo de 2018, el señor Duarte Rosario presentó ante la Secretaría de Apelaciones Administrativas y Procedimientos Adjudicativos del Departamento de Hacienda una *Solicitud Urgente de Vista Administrativa.*

Tras varios trámites administrativos, finalmente se celebró una vista administrativa el 13 de marzo de 2019, emitiendo el Dpto. de Hacienda una *Resolución,* el 26 de junio de 2019, declarando *Ha Lugar* la querella del señor Duarte Rosario, por tanto, dejando sin efecto las multas impuestas.

Es así como, el 16 de julio de 2019, el señor Duarte Rosario presentó la *Demanda* ante el TPI cuyo contenido hemos descrito en los párrafos que preceden.

En respuesta, las apelantes presentaron una *Moción de Desestimación,* aduciendo que: (1) que la causa instada no estaba

autorizada por la Ley de Pleitos Contra el Estado, *infra*, pues se trataba de una controversia sobre la imposición de contribuciones; (2) que el Estado Libre Asociado no fue notificado dentro del término de 90 días que manda la ley antes citada; y (3) que el término de un año para instar la acción había transcurrido sin que se hubiera presentada la *Demanda*, es decir, que estaba prescrita.

El TPI emitió una denegatoria de la solicitud de desestimación.

Tal denegatoria dio lugar a que las apelantes recurrieran a este Foro intermedio, mediante recurso de *certiorari*. En esa ocasión, emitimos una *Resolución*, el 30 de noviembre de 2020, en la que decidimos no expedir el auto de *certiorari* solicitado. Al así actuar indicamos que, al menos en esa etapa de los procedimientos, donde estábamos obligados a considerar como ciertas las alegaciones incluidas en la *Demanda*, no se justificaba nuestra intervención. Aclaramos, además, que nuestras expresiones no constituían una adjudicación de la controversia alzada en los méritos.

Superados numerosos asuntos procesales, las apelantes recurrieron en una segunda ocasión a este foro apelativo, impugnando esta vez la denegatoria por el TPI de una solicitud de sentencia sumaria en la cual el Gobierno arguyó sobre la prescripción de la causa de acción. Mediante *Resolución* del 18 de agosto de 2022, determinamos denegar la expedición del recurso de *certiorari*.

Así, el foro primario celebró el juicio en su fondo, sopesando la prueba documental y testifical que desfiló ante su consideración. Como resultado emitió la *Sentencia* que aquí se apela, declarando *Ha Lugar* la *Demanda* sobre daños y perjuicios presentada por el señor Duarte Rosario, condenando a las apelantes y al Dpto. de Hacienda al pago solidario de $60,000, más costas y honorarios de abogados.

Inconformes, las partes apelantes solicitaron la reconsideración del dictamen ante el mismo foro primario, pero fue declarada *No Ha Lugar*.

A raíz de ello, las señoras Nieves González y Nieves Franco acudieron ante nosotros mediante el recurso de apelación identificado con el alfanumérico KLAN202400377, levantando los siguientes errores:

El Tribunal de Primera Instancia incidió al negarse a desestimar la causa de acción de da[ñ]os y perjuicios del señor Duarte Rosario por prescripción ya que los presuntos da[ñ]os no son continuados.

El Tribunal de Primera Instancia incurrió en error manifiesto al: (1) concluir que el señor [D]uarte [R]osario sufrió da[ñ]os ocasionados por los alegados actos de las codemandadas, ya que no present[ó] prueba preponderante para demostrarlo, y (2) al no aplicar la defensa de inmunidad condicionada a las codemandadas ante dichos presuntos actos.

El Tribunal de Primera Instancia incidió al conceder al señor Duarte Rosario la cuantía de $60,000.00 por concepto de los alegados da[ñ]os sufridos y la suma de $5,000.00 por concepto de honorarios de abogado.

Por otro lado, el Departamento de Hacienda también acudió ante nosotros, mediante el recurso de apelación identificado como KLAN202400378, señalando la comisión de los siguientes errores:

Erró y cometió error manifiesto el Tribunal de Primera Instancia al concluir que la demanda del señor Duarte Rosario no estaba prescrita por tratarse de un daño continuado.

Erró y cometió error manifiesto el Tribunal de Primera Instancia al decidir que el señor Duarte Rosario no tenía que cumplir con la notificación al Estado dentro del término de noventa días a partir del conocimiento del daño.

Erró el Tribunal de Primera Instancia al concluir que el señor Duarte Rosario probó los daños emocionales reclamados o, en la alternativa, al conceder por concepto de estos una cuantía excesivamente alta.

Erró el Tribunal de Primera Instancia al imponer a las partes demandadas una cuantía por honorarios de abogado a pesar de que no existe prueba de temeridad que la justifique.

## II. Exposición de Derecho

### i. Constitución

La Constitución del Estado Libre Asociado de Puerto Rico, reconoce que la dignidad del ser humano es inviolable. A tales efectos, en esta se

indica que "[t]odos los hombres son iguales ante la Ley" y que "[n]o podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas." Art. II, Sec.1, Const. ELA, LPRA, Tomo 1, pág. 275.

### ii. *Reclamaciones contra el Estado*

En nuestro ordenamiento es concebible que el Estado sea responsable por las actuaciones de sus agentes y funcionarios, en tanto acontezcan los supuestos contemplados por la Ley 104-1955, conocida como la *Ley de Reclamaciones y Demandas contra el Estado*, 32 LPRA sec. 3077 *et seq.* (Ley 104). Ello parte de la doctrina de la inmunidad soberana, que, de manera genérica, impide que se presenten reclamaciones judiciales contra el Estado, a menos que este consienta en ser demandado. *Defendini Collazo et al. v. ELA,* 134 DPR 28, 40 (1993).

A tenor, bajo la Ley 104 el Estado autorizó a ser demandado en acciones por daños y perjuicios causados por la acción u omisión culposa o negligente de cualquiera de sus funcionarios, agentes o empleados, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo, entre otros escenarios. Art. 2A de la Ley 104, *supra,* 32 LPRA sec. 3077. En consecuencia, una causa de acción por daños y perjuicios contra el Estado prospera cuando los mismos fueron causados por la negligencia de funcionarios o empleados públicos actuando dentro del marco de sus funciones, cargo o empleo. *Íd.*; *García v. ELA,* 163 DPR 800, 812-813 (2005).

Como norma general para que proceda ordenar la reparación de un daño es necesario que concurran los siguientes requisitos: (1) el acto u omisión culposa o negligente; (2) la relación causal entre el acto u omisión culposa o negligente y el daño ocasionado; y (3) el daño real causado al reclamante. *Nieves Díaz v. González Massas,* 178 DPR 820, 843 (2010). Sin embargo, de conformidad con la Ley 104, es necesaria la concurrencia de varios requisitos para encontrar al Estado incurso en responsabilidad por

los daños y perjuicios causados por sus empleados, agentes o funcionarios, a saber; (1) que la persona que causó el daño era agente, funcionario o empleado del Estado y que estaba actuando en su capacidad oficial al momento de causar el daño; (2) que el agente, funcionario o empleado actuó dentro del marco de su función; (3) que la actuación del empleado fue negligente y no intencional; (4) que existe relación causal entre la conducta culposa y el daño producido. *Weber Carrillo v. ELA et al.*, 190 DPR 688, 723-724 (2014); *García v. ELA*, supra, pág. 811-812; *Leyva et al. v. Aristud et al.*, 132 DPR 489, 510-511 (1993).

Cumplido tales requisitos, el ELA está sujeto a responsabilidad en cualquiera de los supuestos siguientes: (1) cuando el empleado, agente o funcionario causa un daño por su exclusiva culpa o negligencia, mientras desempeña sus funciones y actúa en su capacidad oficial; (2) cuando el empleado, agente o funcionario causa un daño mientras desempeña sus funciones y actúa en su capacidad oficial por una actuación preponderantemente negligente aun cuando dicha conducta tenga algunos elementos intencionales. Véase, *Galarza Soto v. E.L.A.*, 109 D.P.R. 179 (1979); *Morales Garay v. Roldán Coss*, 110 D.P.R. 701 (1987); (3) cuando, a pesar de que el daño fue directamente producido por un acto enteramente intencional de los cuales no responde el Estado, hubo otros actos negligentes separados de cocausantes del daño por los cuales sí debe responder el Estado y, (4) cual el Estado a través de sus agentes es negligente por omisión al incumplir con un deber impuesto por las leyes y la Constitución. *Leyva v. Aristud*, supra, págs. 510-511.

Finalmente, el Artículo 8 del estatuto bajo discusión, 32 LPRA sec. 3083, dispone que "[l]a sentencia contra el Estado no incluirá en ningún caso el pago de intereses por período alguno anterior a la sentencia ni concederá daños punitivos".

### *iii Inmunidad condicionada*

Jurisprudencialmente se adoptó la doctrina de inmunidad condicionada de los funcionarios de la Rama Ejecutiva ante reclamaciones de responsabilidad civil que pudieran generar sus conductas en el desempeño de sus deberes oficiales. *Acevedo v. Srio. Servicios Sociales*, 112 DPR 256, 262 (1982). Por la inmunidad condicionada ser una defensa afirmativa, la carga probatoria recae sobre el funcionario público que la levanta. *Íd.*, pág. 263.

La inmunidad condicionada es independiente de la inmunidad soberana del Estado. *Romero Arroyo v. ELA*, 127 DPR 724, 745 (1991). La inmunidad del Estado limita la responsabilidad civil de la entidad gubernamental, mientras que la inmunidad condicionada limita la responsabilidad personal de los funcionarios públicos por el daño causado en el descargo de sus deberes. *Íd.*

Esta doctrina aplica al funcionario público que ejerza deberes que contienen un elemento discrecional, de forma razonable y de buena fe. *De Paz Lisk v. Aponte Roque*, 124 DPR 472, 495 (1989). Ahora bien, dicha acción discrecional no puede violar derechos estatutarios ni constitucionales claramente establecidos, de los cuales una persona razonable tuviese conocimiento. *Harlow c. Fitzgerald*, 457 US 800, 818 (1982). La aplicación de la doctrina depende del alcance de la discreción del funcionario público, sus responsabilidades, la creencia de motivos fundados y buena fe, más la totalidad de las circunstancias. *Procunier v. Navarette*, 434 US 555, 561-562 (1978), *citando a Scheuer v. Rhodes*, 416 US 232, 247-248 (1683). El objetivo es que "actúen con libertad y tomen decisiones sin sentir presiones y amenazas contra sus patrimonios". *De Paz Lisk v. Aponte Roque*, supra, pág. 495. Por otro lado, no procede responsabilizar en su carácter personal al funcionario público que actuó conforme con las directrices oficiales. *Íd.*

Como es sabido, la inmunidad condicionada no es absoluta. Pues, el funcionario público responde si no actúa de buena fe o si, aun mediando la

buena fe, procedió irrazonablemente o sabía que su conducta era ilegal. *Acevedo v. Srio. Servicios Sociales*, supra, pág. 262. En este aspecto, "[l]a razonabilidad de la actuación oficial constituye una cuestión de hecho a determinarse caso por caso". *Íd.* Sin embargo, la buena fe no es el único criterio que debe evaluarse, puesto que no se pueden violar principios legales establecidos. *Íd.* Esta inmunidad no cubre actuaciones dolosas, fraudulentas, maliciosas o delictivas del funcionario en el ejercicio de sus funciones. *In re Colton Fontán*, 128 DPR 1, 8 (1991); *Romero Arroyo v. ELA*, *supra*, pág. 743.

### iv. Emplazamiento al ELA

Aunque el ELA permitió que toda persona que tuviere reclamaciones en su contra pudiera presentar una acción en daños, cuando haya mediado culpa o negligencia por parte del Estado o funcionarios, dicha renuncia estaba sujeta a varias condiciones. Entre estas se encuentra la establecida en el Artículo 2-A de la Ley 104 que requiere notificar al ELA a través del Secretario de Justicia, dentro de los noventa (90) días siguientes a la fecha en que el demandante tuvo conocimiento de los daños. 32 LPRA sec. 3077a. El incumplimiento con el requisito de dicha notificación es capaz de impedir reclamaciones torticeras contra el Estado. *Toro Rivera v. ELA*, 194 DPR 393, 410 (2015). Se impone en el agraviado el deber de dirigir una notificación escrita al Secretario de Justicia, como requisito de cumplimiento estricto a ser satisfecho antes de entablar una acción judicial en contra del cuerpo político. *Íd.*

Ya en *Berríos Román v. ELA*, 171 DPR 549 (2007), nuestro alto foro había delineado con precisión el perfil normativo del requisito de notificación bajo la Ley Núm. 104. Así pues, afirmó:

> "La norma general es que el requisito de notificación debe ser aplicado, de manera rigurosa, en acciones contra el Estado o los municipios por daños ocasionados por su culpa o negligencia de estos." Sobre la importancia del requisito de notificación hemos señalado que éste "es una parte esencial de la causa de acción y, a menos que se cumpla con la misma, no existe derecho a demandar. *Íd.*, pág. 559.

En otras palabras:

[E]l requisito de notificación opera como una limitación al derecho a demandar en daños y perjuicios al Estado por las actuaciones u omisiones culposas o negligentes de sus agentes, funcionarios o empleados. No obstante, en determinadas circunstancias, la Ley Núm. 104 extiende el período estatutario para notificar al Estado y exime al reclamante de cumplir con dicho requisito si demuestra la existencia de justa causa. *Íd.*

Ahora bien, el mismo alto foro ha eximido a un demandante del requisito de notificación al ELA cuando "sus objetivos carecen de virtualidad y conllevarían una injusticia". *Toro Rivera v. ELA,* supra, pág. 440. Así, se ha liberado del cumplimiento con el requisito de notificación bajo la Ley Núm. 104 en casos donde:

(1) el daño o la negligencia fue cometido por el mismo funcionario a quien se tiene que notificar, pues posee el conocimiento de los hechos; (2) el emplazamiento ocurre en el plazo de noventa días provisto para la notificación; (3) la tardanza en la notificación no es imputable al demandante; (4) el riesgo de desaparición de la prueba objetiva es mínimo, hay constancia de la identidad de los testigos y el Estado puede investigar y corroborar los hechos con facilidad; (5) el Estado renuncia a la defensa de falta de notificación, y (6) se insta una acción directa contra la aseguradora, entre otras. *Íd.*, págs. 339-440.

La presentación de la demanda y el diligenciamiento del emplazamiento dentro del término de noventa (90) días desde que el reclamante tuvo conocimiento de los daños que reclama cumple cabalmente con el propósito del requisito de la notificación previa de dar aviso de la reclamación para que se activen los mecanismos de investigación del Gobierno antes de que desaparezcan los testigos y la prueba objetiva. *Passalaqua v. Mun. De San Juan,* 116 DPR 618, 631 (1985).

### v. Daños continuos y sucesivos

El Artículo 1536 del Código Civil de 2020, 31 LPRA sec. 10801, establece que "[l]a persona que por culpa o negligencia causa daño a otra, viene obligada a repararlo". A tenor, para conceder la reparación de un daño es necesario que la parte promovente de la acción demuestre lo siguiente: (1) el acto u omisión culposa o negligente; (2) la relación causal entre el acto u omisión culposa o negligente; y (3) el daño real causado al reclamante. *Nieves Díaz v. González Massas,* 178 DPR 820, 843 (2010).

El Tribunal Supremo de Puerto Rico ha reconocido y distinguido varios tipos de daños. Entre ellos se encuentran los daños continuos o

continuados y los daños sucesivos. Los primeros fueron definidos por

nuestro alto foro como:

> ...aquellos producidos por uno o más actos culposos o negligentes imputables al actor, coetáneos o no, que resultan en consecuencias lesivas ininterrumpidas, sostenidas, duraderas sin interrupción, unidas entre sí, las cuales al ser conocidas hacen que también se conozca por ser previsible el carácter continuado e ininterrumpido de sus efectos, convirtiéndose en ese momento en un daño cierto compuesto por elementos de daño actual (aquel que ya ha acaecido) y de daño futuro previsible y por tanto cierto. *Rivera Ruiz v. Mun. de Ponce,* 196 DPR 410, 417 (2016).

Más reciente aun, en *Landrau Cabezudo v. Puertos et al.,* 2025 TSPR

7, 215 DPR ___ (2025), el Tribunal Supremo precisó lo que sigue sobre los

daños continuados:

> Aunque se refiere a daños, se ha clarificado que lo que en realidad es continuo en estos escenarios es el acto u omisión que produce el daño. Hemos explicado que los daños continuados se tratan de lesiones causadas por una conducta torticera continua que genera una sola causa de acción que comprende todos los daños ciertos, tanto los actuales como los previsibles en el futuro. En estos casos lo continuo o progresivo no es el daño o perjuicio ocasionado, sino la causa que lo origina y que produce resultados razonablemente previsibles. (Citas omitidas).

En suma, estos tipos de daños se distinguen por ser derivados de un

acto ilícito como unidad y no como una pluralidad de daños particulares.

*Toro Rivera v. ELA,* supra, pág. 417.

A modo de ejemplo sobre la aplicación de dicha doctrina en nuestra

jurisdicción, en *Santiago v. Ríos Alonso,* 156 DPR 181, 195-196 (2002), el

Tribunal Supremo sostuvo que:

> A tenor con la doctrina de los daños continuados correspondiente a las acciones donde cada acto de violencia, tanto físico como emocional, forma parte de un patrón, ambiente o ciclo de maltrato e intimidación, *el último incidente de maltrato, cuando la víctima rompe con el ciclo de maltrato y reconoce que ha sufrido un daño cierto, es el que activa la causa de acción y, en consecuencia, constituye el momento a partir del cual puede ejecutarse la misma.* Véase, *Galib Frangie v. El Vocero de P.R.,* ante.
>
> Resolver de otra manera, como pretende el peticionario, y tomar cada acto de agresión de manera aislada o por separado, sin tomar en consideración la alegada violencia sicológica, *es frustrar este tipo de reclamación.* Se puede colegir lo oneroso que sería para una agraviada, víctima de maltrato, una postura que requiera de ésta ejercer su causa de acción, o algún acto que interrumpa el término, *cuando la situación que padece, esto es, su estado sicológico, no sólo le impide reconocer que ha sufrido un daño cierto sino que tampoco le*

*permite reconocer todos los elementos necesarios para poder ejercer dicha causa de acción.*

*[...]*

El maltrato en casos de violencia doméstica se compone, de ordinario, *de un daño encadenado y cíclico que forma un patrón de conducta.* En otras palabras, *y por su propia naturaleza,* este tipo de reclamación, esto es, daños por el maltrato físico y emocional durante una relación consensual, *ordinariamente presenta una serie de actos que, en conjunto, producen el efecto dañino motivo del resarcimiento invocado.*

Por su parte, y sobre los daños sucesivos, en *Cacho González v. Santarrosa,* 203 DPR 215, 222-223 (2019), nuestro alto foro sostuvo:

En cambio, los daños sucesivos constituyen una secuencia de daños individuales y concretos que se producen en intervalos finitos de tiempo. Cada lesión a causa de un acto u omisión culposa o negligente produce un daño distinto, que a su vez genera una causa de acción independiente. Son daños ciertos que se van repitiendo, sin que necesariamente sean idénticos, y que no son previsibles o susceptibles de ser descubiertos empleando diligencia razonable.

Similar a lo expresado en *Landrau Cabezudo v. Puertos et al.,* supra, en *Cacho González v. Santarrosa,* supra, el Tribunal Supremo aclaró, que, aunque tradicionalmente se han referido a las doctrinas bajo estudio como daños continuos o daños sucesivos, "[l]o que en realidad es continuo o sucesivo en estos escenarios es el acto u omisión que produce el daño y no, necesariamente, la lesión sufrida". *Íd.,* pág. 223. Lo anterior permite poder distinguir los hechos de cada caso y aplicar la doctrina correspondiente.

En definitiva, los daños continuados tienen tres rasgos distintivos: (1) nace de uno o varios actos culposos o negligentes imputables al mismo actor; (2) los daños ocasionados se manifiestan ininterrumpidamente, y (3) esos daños, en conjunto, conforman un proceso perjudicial progresivo de carácter unitario. *Velázquez Ortiz v. Mun. Humacao,* 197 DPR 656, 665-666 (2017).

En *Rivera Ruiz v. Mun. de Ponce,* supra, pág. 426, y ahora en *Landrau Cabezudo v. Puertos et al.,* supra, el Tribunal Supremo zanjó que, ante daños y perjuicios causados por cualquier acto u omisión culposo o negligente de carácter continuado, el término prescriptivo para incoar una acción para solicitar resarcimiento comienza a transcurrir cuando se

verifiquen los últimos actos u omisiones o se produzca el resultado definitivo, lo que sea posterior. Advirtió el mismo alto foro en la próxima oración de *Rivera Ruiz v. Mun. de Ponce*, supra, que la norma establecida no es incompatible con la teoría cognoscitiva del daño que rige en nuestro ordenamiento. Por estar los daños continuados inexorablemente atados a la causa que los origina, el conocimiento definitivo de los quebrantos ocasionados se verifica el día que cesa la fuente de éstos, ya que mientras ésta exista y, por ende, sean previsibles más daños relacionados a ella, no cabe hablar de resultado definitivo. *Íd.* (Comillas omitidas). El carácter continuado de este tipo de daños recae sobre la causa -entiéndase, el acto o la omisión- que los produce y no en la lesión sufrida. *Rivera Ruiz v. Mun. de Ponce*, supra.

### vi. Revisión de las determinaciones de hechos

Según es sabido, la fase apelativa está caracterizada por la norma de deferencia judicial que mostramos al ejercicio de aquilatar credibilidad que efectúa el tribunal *a quo* al sopesar la prueba testifical. Esta norma parte de la premisa de que es el foro primario el que está en mejor posición para evaluar y adjudicar la credibilidad de los testigos, pues tuvo la oportunidad de escuchar y ver declarar los testigos. *Rivera Torres v. Díaz López*, 207 DPR 636, 658 (2021); *Sucn. Rosado v. Acevedo Marrero*, 196 DPR 884, 917 (2016); *SLG Rivera Carrasquillo v. AAA*, 177 DPR 345, 356 (2009); *López v. Dr. Cañizares*, 163 DPR 119, 136 (2004). Después de todo, el "foro apelativo cuenta solamente con récords mudos e inexpresivos", de ahí el respeto a la adjudicación de credibilidad realizada por el foro primario. *Rivera Torres v. Díaz López*, supra, pág. 658; *SLG Rivera Carrasquillo v. AAA*, supra, pág. 356. Los foros apelativos no deben intervenir con la apreciación de la prueba realizada por el Tribunal de Primera Instancia, a menos que se demuestre que medió pasión, prejuicio, parcialidad o error manifiesto del foro primario. *Rivera Torres v. Díaz López*, supra, pág. 658; *Sucn. Rosado*

*v. Acevedo Marrero*, supra, pág. 917; *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 753 (2013).

De lo que resulta que los foros apelativos no deben intervenir con el ejercicio de discreción de los foros de instancia, salvo que quede demostrado un abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo; y que la intervención del foro apelativo en la etapa en que se trae el asunto ante su consideración evitaría un perjuicio sustancial. *Lluch v. España Services Sta.*, 117 DPR 729, 745 (1986).

Esto quiere decir que un tribunal revisor podrá intervenir con la apreciación de la prueba cuando de un examen detenido de la misma quede convencido de que el juzgador descartó injustificadamente elementos probatorios importantes o que fundamentó su criterio únicamente en testimonios de escaso valor, o inherentemente improbables o increíbles. *C. Brewer P.R., Inc. v. Rodríguez*, 100 DPR 826, 830 (1972); *Pueblo v. Luciano Arroyo*, 83 DPR 573, 581 (1961).

### vii. *Honorarios de abogado*

Bajo nuestro ordenamiento procesal civil se sanciona la temeridad de un litigante perdidoso mediante la imposición del pago de honorarios de abogado en virtud de la Regla 44.1(d) de Procedimiento Civil, 32A LPRA Ap. V, R.44.1(d).

El propósito principal de esta regla es establecer una penalidad a un litigante perdidoso que, por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente a asumir molestias, gastos, trabajo e inconveniencias de un pleito, afectando a su vez el buen funcionamiento y la administración de la justicia. *S.L.G. Flores, Jiménez v. Colberg*, 173 DPR 843, 866 (2008); *Vega v. Luna Torres*, 126 DPR 370, 375 (1990).

En el caso del ELA, la Regla 34.6, 32 LPRA Ap. V, Regla 36.4, faculta al tribunal a imponerle gastos y honorarios de abogado, siempre que se celebre una vista previa a tales efectos.

La determinación de temeridad es de índole discrecional, por lo que sólo debemos intervenir con ella cuando nos enfrentemos a un caso de abuso de discreción. *S.L.G. Flores, Jiménez v. Colberg*, supra, pág. 866. En consonancia, la partida de honorarios de abogado no se variará en apelación, salvo que la misma resulte excesiva, exigua o constituya un abuso de discreción. *Corpak, Art Printing v. Ramallo Brothers*, 124 DPR 724, 740 (1990)

### III. Aplicación del Derecho a los hechos

a.

En este caso resulta medular determinar en qué momento comenzó a decursar el término prescriptivo para que el apelado pudiera instar la causa de acción en daños y perjuicios contra los apelantes, asunto que tiene repercusiones en casi la totalidad de los señalamientos de error alzados. Sobre esta controversia el tribunal *a quo* determinó que la causa de acción instada no estaba prescrita porque, conforme con la teoría del daño continuado, el punto de partida para calcular el término prescriptivo fue la notificación de la *Resolución* emitida por la agencia el 26 de junio de 2019, mientras que la *Demanda* fue presentada el 16 de julio de 2019. Es decir, distinto a la teoría legal enarbolada por los apelantes en las distintas etapas de este caso, luego de sopesar la prueba ante su consideración el foro apelado juzgó que los daños ocasionados fueron continuados, no sucesivos, y por ello la causa de acción había sido instada de manera oportuna.

En oposición a dicho desenlace, en su primer señalamiento de error las señoras Nieves González y Nieves Franco impulsan ante nosotros la doctrina del daño sucesivo como la aplicable en el caso, a partir de lo cual afirman que la causa de acción estaba prescrita al momento de presentarse

la *Demanda*. A tenor, arguyen que los presuntos actos discriminatorios y negligentes ocurridos en octubre de 2015 eran de *naturaleza distinta* al procedimiento administrativo que luego se inició ante el Dpto. de Hacienda. En la misma línea, añaden que los tales presuntos actos discriminatorios no hubiesen alterado el proceso administrativo, una vez el NIC identificara irregularidades, infracciones y/o deficiencias en los comercios, tal y como ocurrió en el presente caso.

Sumándose al mismo argumento sobre la aplicación de la teoría sobre el daño sucesivo, el Dpto. de Hacienda aduce que la causa de acción que dio lugar al inicio del pleito prescribió, puesto que el trámite administrativo que culminó en el año 2019 no fue una consecuencia duradera, ininterrumpida de los eventos acontecidos en el 2015.

Evaluadas tales premisas, juzgamos que las teorías de las partes apelantes dejan de considerar que los actos discriminatorios y negligentes de las codemandadas, y la acción agencial que dio inicio por causa de estos, estuvieron íntimamente relacionados. Contrario a la propuesta de los apelantes, no vemos fractura entre los eventos que dieron inicio al proceso administrativo a través de la actuación de las apeladas, que culminó con la *Resolución* del Dpto. de Hacienda declarando *No Ha Lugar* la querella presentada en contra del aquí apelado.

Sobre lo anterior, obsérvese que, por una parte, al foro primario no le mereció credibilidad que la intervención del 14 de octubre de 2015 de la señora Nieves González, la señora Nieves Franco y el señor Maldonado Torres con el señor Duarte Rosario fuese parte de las inspecciones rutinarias que les correspondiese atender, ni que tuviera instrucciones de su supervisor para ello.[3] Sin embargo, por la otra parte, lo cierto es que la intervención inicial de las apelantes con el apelado aconteció dentro del marco de las funciones que estas realizan de ordinario, como funcionarias

---

[3] Ver, *Sentencia*, determinaciones de hecho núm. 28 y 29.

del área de Rentas Internas del Negociado de Impuesto y Consumo. Es decir, el requerimiento de las apelantes al apelado acerca del cobro del IVU-LOTO, la muestra del recibo como comprobante de ello, la posterior segunda visita que dio lugar a la expedición de la multa administrativa,[4] son funciones que le correspondían asumir a las apelantes, aunque, como quedó probado, se hubiesen extralimitado en su ejercicio, imprimiendo el carácter discriminatorio y lesivo a la dignidad del apelado.

Sobre lo mismo, fue luego de la apelante Nieves González requerirle la información al apelado referente al cumplimiento de las obligaciones contributivas, que entonces le manifestó que lo iba a "joder", "porque los dominicanos lo que vienen es a "robar".[5]

Añádase que, al cabo de tan solo cinco (5) días de lo narrado, el señor Duarte Rosario regresó al Dpto. de Hacienda para continuar con los intentos de resolver la situación del terminal dañado y **allí le entregaron un documento explicándole que ya no iba a usar más el terminal porque sus ventas eran menores a $125,000 anuales. Aun así**, y según prometido, el 14 de octubre de 2015, las agentes-demandadas incurrieron en las conductas relacionadas a las palabras soeces dirigidas a la parte apelada, las cuales se concretaron dos días más tarde mediante la imposición de dos penalidades bajo la Sección 6043.06 (c) del Código de Rentas Internas, por la cantidad de $20,000.00 cada una, para un total de $40,000.00 -el máximo posible permitido por ley. Se vincula así con claridad la expresión de una de las apelantes, señora Nieves González, que amenazó al recurrido de *joderlo, porque los dominicanos vienen a robar*, con que luego fueran impuestas las multas descritas, **demostrando esto una innegable imbricación o nexo entre la conducta lesiva-discriminatoria de la apelante dirigida contra el apelado, con el desempeño de sus**

---

[4] Ver, *Sentencia*, determinaciones de hechos, núm. 22-24 y 27, 28, 32, 34,37 y 41.
[5] *Íd.*, determinaciones de hechos 24 y 34.

**funciones como empleada del Dpto. de Hacienda, y la continuación de los procesos en dicha agencia**.

Ahora bien, **tal patrón de conducta lesiva no fue interrumpido o mucho menos culminó con las expresiones, trato y acciones peyorativas descritas, ni con la notificación de las multas, sino que se extendió hasta la *Resolución* del 26 de junio de 2019, como parte de la acción de una misma agencia gubernamental**. A saber, desde el 14 de octubre de 2015 las agentes-demandadas se negaron a recibir la información que el señor Duarte Rosario le estaba ofreciendo sobre las gestiones que había realizado con el terminal dañado y los números de querellas. Dicha negativa llevó a que, el 23 de octubre de 2015, el señor Duarte Rosario presentara personalmente una carta al Secretario de Hacienda indicando que, al momento de la inspección del 14 de octubre de 2015, le explicó a la agente de rentas internas Nieves González que el terminal estaba dañado y le mostró las gestiones que había realizado desde el mes de marzo 2015, pero que esta no le hizo caso. Según las determinaciones de hechos del TPI, que en modo alguno han sido exitosamente impugnadas ante nosotros, las acciones del apelado ante el Dpto. de Hacienda para obtener remedio, y que no se le continuara causando daños, se mantuvieron de manera ininterrumpidas hasta la *Resolución* del 26 de junio de 2019, fecha en que se dispuso que "el Negociado reconoció que la parte Querellante había realizado las gestiones correspondientes a los efectos de que su terminal fiscal estaba dañado **previo a la inspección de los agentes e imposición de la multa**". (Énfasis provisto).

Entonces, de conformidad con el razonamiento de *Santiago v. Ríos Alonso,* supra, somos del criterio que la acumulación de cada uno de los incidentes, incluyendo la reiterada notificación de una multa inválida al apelado por parte del Dpto. de Hacienda, (Exhibit 9 Notificación de Requerimiento de Pago de Contribuciones Impuesto Sobre Ventas y Uso del

5 de diciembre de 2016, 4 de enero de 2017, 12 de mayo de 2017), la negativa a corregir, y la admisión al final del Negociado, reafirmó el acto discriminatorio inicial, produciendo el *efecto neto* de revictimizar continuamente al señor Duarte Rosario. Según adelantamos, dicho patrón lesivo concluyó con el archivo de las multas, puesto que este fue el acto que dio finalidad a las acciones opresivas cuya raíz fueron las actuaciones de las partes apelantes. Así, los daños se configuraron por la concatenación de varios eventos provocados inicialmente por funcionarias del Dpto. de Hacienda, y luego continuados por dicha agencia que, unidos entre sí, constituyeron un patrón de comportamiento que procuraba un particular estado de aprehensión en la parte apelada. *Véase Toro Rivera v. ELA*, supra.

En este punto resulta pertinente aludir a las manifestaciones vertidas en *Cacho González v. Santarrosa*, supra, pág. 226, donde nuestro Tribunal Supremo reconoció que **hay casos que tienen particularidades que ameritan darles un trato distinto.** El alto foro puso como ejemplo los casos de violencia doméstica y de ambiente hostil, al concluir que ubicaban dentro de modalidades de *daños continuados*, pues en estos la parte culposa o negligente *mantuvo una condición* de maltrato u hostilidad en el empleo que no cesó hasta que fueron tomadas acciones positivas para remediarlas o hasta que la parte afectada rompió con el ciclo de maltrato o escapó del ambiente hostil. De ello se sigue que, cuando los actos causantes del daño ocurren como parte de una conducta opresiva reiterada y sistemática, el término prescriptivo no comienza hasta que esta cesa. En la *praxis* ello necesariamente comporta que no se obligue al perjudicado a seleccionar un punto arbitrario en el tiempo para presentar su reclamo, cuando lo que experimenta es un daño que se prolonga y se acumula con cada incidente.

Consistente con esto último, debemos tener presente que cuando se trata de una **pluralidad de daños ciertos de conocimiento coetáneo por**

**parte del perjudicado, el resultado a que se llegue en cuanto al comienzo del término prescriptivo debe ser cónsono con la teoría cognoscitiva del daño.** Herminio M. Brau del Toro Daños y Perjuicios Extracontractuales, pág. 648. Además, la prescripción no es una figura rígida, sino que admite ajustes judiciales, según sea requerido por las circunstancias particulares de los casos y la noción sobre lo que es justo. *Santiago v. Ríos Alonso*, supra, pág. 190. Por tanto, es precisamente la naturaleza del agravio sufrido por el señor Duarte Rosario lo que amerita ese trato distinto, pues el cúmulo de actos iniciados el 8 de octubre de 2015 y finalizados el 26 de junio de 2019 alcanzó su degradación moral y emocional en clara contravención de uno de nuestros derechos constitucionales fundamentales, el de la inviolabilidad de la dignidad del ser humano.

Por lo explicado, concluimos que acoger la teoría legal de los apelantes en este caso resultaría incompatible con la doctrina que exige conocimiento *relativo* y *efectivo* del daño, según explicamos. Véase *Maldonado Rivera v. Suárez*, 195 DPR 182 (2016); *COSSEC et al. v. González López et al.*, 179 DPR 793, 806 (2010); *Colón Prieto v. Géigel*, 115 DPR 232, 247 (1984); *Santiago v. Ríos Alonso*, supra, pág. 189. Además, por las circunstancias particulares de este caso, juzgamos que seguir el curso decisorio al que nos convidan los apelantes implicaría acoger una interpretación rígida de la prescripción, contraria a casos como el de *Santiago v. Ríos Alonso*, supra, con los que encontramos puntos de encuentro en la situación planteada ante nosotros. Además, valoramos que nuestro curso decisorio tampoco desvirtúa los propósitos de la figura de la prescripción, puesto que la información relacionada a las alegaciones del señor Duarte Rosario siempre ha estado en manos del Dpto. de Hacienda.

Por otra parte, admitimos que la ley orgánica del Dpto. de Hacienda no le reconoce facultad para, a través del proceso administrativo, indemnizar a la parte apelada por los daños y perjuicios sufridos por

discrimen, siendo el foro judicial quien ostenta la jurisdicción para conocer de tal asunto. *Cuando un foro administrativo no está facultado por ley para conceder compensación por los daños y perjuicios sufridos, este Tribunal ha sido claro en que la parte perjudicada puede acudir directamente al foro judicial con su acción civil extracontractual. Muñoz Barrientos v. ELA*, 212 DPR 714 (2023). Sin embargo, la norma jurisprudencial que admite la presentación de una causa de acción por daños y perjuicios en el tribunal ante tal circunstancia nos resulta perfectamente armonizable con las conclusiones a las que arribamos aquí, toda vez que estamos dando respuesta a la interrogante sobre *cuándo* era el momento oportuno para, precisamente, **instar la acción ante el foro con jurisdicción sobre el asunto cuando se sufren daños continuados**. En concreto, por virtud de la identificación de los daños aquí esgrimidos como unos continuados, el término para presentar la causa de acción ante el Tribunal inició *cuando el perjudicado supo que tenía una reclamación contra el Estado o razonablemente debió haberlo sabido, Toro Rivera v. ELA*, supra, pág. 425, lo que se concretizó con la determinación del Dpto. de Hacienda disponiendo de la querella.

Aunque reiteremos, en *Toro Riera v. ELA*, supra, el Tribunal Supremo resolvió que la fecha para el cómputo del término en el cual existe el deber de notificar al Estado es aquella que cumple con los requisitos esbozados aplicables al inicio del término prescriptivo. Por tanto, el punto de partida no necesariamente va a coincidir con la ocurrencia de la alegada conducta lesiva, **sino que la obligación nace desde que el agraviado adquirió conocimiento del daño, o razonablemente debió adquirirlo, quién lo causó, así como los detalles necesarios para poder iniciar efectivamente su reclamación.** *Toro Rivera v. ELA*, supra. Así, tanto el término prescriptivo, como el deber de notificar al Estado de su intención

de demandarle, comenzaron a transcurrir a partir de la notificación de la *Resolución* emitida el 26 de junio de 2019.

Ahora bien, la notificación es un requisito de cumplimiento estricto, no jurisdiccional, por lo que nuestro Tribunal Supremo ha eximido de su cumplimiento cuando, de lo contrario, se sancionaría una gran injusticia. *Rosario Mercado v. ELA*, 189 DPR 561, 567 (2013). Una de estas excepciones al requisito de notificar ocurre cuando ***se demanda y emplaza al ente gubernamental dentro de los 90 días que requiere la ley para notificarle***. Por tanto, para que aplicara dicha excepción en el presente caso, el señor Duarte tenía hasta el 24 de septiembre de 2019 para demandar y emplazar al Estado, tomando como punto de partida la *Resolución* del 26 de junio de 2019. Entonces, al demandar y emplazar al Estado los días 16 y 18 del mes de julio de 2019, respectivamente, aplica la excepción a la notificación dentro de los 90 días.[6]

b.

Habiendo dispuesto de lo anterior, procedemos a evaluar conjuntamente los demás errores planteados por las partes apelantes en sus respectivos recursos. En general, estos requieren que intervengamos con los juicios sobre credibilidad alcanzados por el TPI, para lo cual estamos seriamente limitados como foro revisor, al no haber tenido la oportunidad de presenciar los testimonios de los testigos. Por dar algunos ejemplos de lo apuntado, por una parte, la señora Nieves González niega haber estado en el negocio del señor Duarte Rosario el 8 de octubre de 2015, y también afirma no haberlo ofendido, amenazado o discriminado ese día, o el 14 de octubre de 2015. Además, las partes apelantes conjuntamente sostienen que el señor Duarte Rosario no pudo proveer los números de incidentes de las gestiones que realizó para arreglar el terminal

---

[6] Al revisar la *oposición a la petición de desestimación* instada por el señor Duarte Rosario notamos que este acreditó la justa causa para notificar al Estado al manifestar que demandó y emplazó al Estado dentro del término estatutario. Apéndice del recurso de apelación, pág. 184.

fiscal. Por su parte, el Dpto. de Hacienda manifiesta que de la prueba testifical no se desprende que el señor Duarte Rosario haya sido coaccionado a firmar el formulario SC-2024.

Sin embargo, lo anterior se encuentra frontalmente con la determinación de hecho número 35 alcanzada por el TPI, en la que se estableció que "[a]unque Nieves González negó que lo narrado por Duarte Rosario hubiera ocurrido, su testimonio evasivo, calculado e inconsistente **no nos mereció credibilidad**".[7] (Énfasis provisto). A lo que se añade la conclusión del mismo foro primario a los efectos de que le mereció *entera credibilidad el testimonio de Duarte Rosario, luego de verlo declarar, escuchar la seguridad de su declaración y naturalidad de su testimonio. No así los testimonios de las codemandadas Nieves González y Nieves Franco. El Tribunal está convencido de que, tal y como [fue] alegado por Duarte Rosario, Nieves González incurrió en conducta discriminatoria en su contra.*[8]

Valga destinar estas líneas para reconocer que **el foro primario fue del todo meticuloso en su *Sentencia* al precisar su juicio valorativo sobre la prueba testifical que presenció**, **detallando la credibilidad que le atribuyó a cada uno de los testigos que testificaron ante su presencia**.

Aun partiendo del reconocimiento a las limitaciones que acompañan nuestra labor revisora ante las determinaciones sobre los testimonios provenientes del foro primario, juzgamos que estas encuentran base en la prueba testifical, según lo observamos en la transcripción de dicha prueba. A saber, el señor Duarte Rosario narró detalladamente el incidente del 8 de diciembre donde la señora Nieves González, luego de consumir en el carrito de *hot dogs,* le inquirió sobre el recibo de IVU loto. Ante ello, el señor Duarte Rosario se sostuvo en la misma postura que mostró hasta la disposición

---

[7] Apéndice del recurso de apelación, pág. 128.
[8] *Íd.*

final del asunto por parte del Dpto. de Hacienda, que había hecho múltiples gestiones, incluyendo dos querellas, para reportar su terminal dañado.[9] Igualmente se sostuvo en su narrativa cuando la señora Nieves González le dijo que lo iba a "joder", "porque los dominicanos lo que vienen es a robar".[10] Idéntica precisión exhibió al contar el incidente del 14 de octubre de 2015, del cual se destaca que, contrario a lo que plantean las partes apelantes, el señor Duarte Rosario sí le ofreció mostrarles la evidencia de las gestiones realizadas para reportar el terminal dañado y estas se negaron a recibirla.[11] Sobre ese particular, en la determinación de hecho número 38, el TPI volvió a manifestar que:

> 38. Aunque Nieves Franco testificó que Duarte Rosario no pudo proveerle la información sobre los números de querellas, su testimonio, confrontado con las gestiones proactivas que realizó Duarte Rosario para reportar el terminal dañado, según surge de los documentos presentados (EXH. 1 parte demandante; EXH. 4 conjunto; EXH. 6 conjunto), **fue inconsistente, ambivalente y no nos mereció credibilidad.**[12] (Énfasis provisto.)

Con todo, los apelantes sostienen que la credibilidad del señor Duarte Rosario fue impugnada durante el juicio, cuando se le permitió admitir o negar lo que declaró en la deposición en cuanto a que no recordaba la hora ni el día de los incidentes del 2015, por lo que incurrió en error manifiesto al darle entera credibilidad.

Sobre ello, no apreciamos ni sombra de prejuicio, parcialidad o pasión en el juicio valorativo del TPI sobre los testimonios de los testigos que tuvo ante sí, que justifique nuestra intervención. Aunque lo dicho resulte suficiente, la prueba testifical también demuestra que la respuesta del señor Duarte Rosario en el juicio fue consistente con la de la deposición.[13] Es decir, el señor Duarte Rosario testificó que no recordaba *la hora,*[14] que en la deposición no dijo que no recordara el día.[15] Así, no

---

[9] Transcripción del 16 de octubre de 2023, págs. 14-15.
[10] Transcripción del 16 de octubre de 2023, pág. 21, líneas 12-14.
[11] Transcripción del 16 de octubre de 2023 pág. 23, líneas 11-31; pág. 42, líneas 3-11.
[12] Apéndice del recurso, pág. 128.
[13] Apéndice del recurso pág. 463 y pág. 67 de la Transcripción, líneas 6-12.
[14] Transcripción del 16 de octubre de 2023, pág. 67, líneas 4-8.
[15] Transcripción del 16 de octubre de 2023, pág. 67, líneas 9-12.

encontramos base en la transcripción de la prueba testifical para acoger la interpretación que proponen las partes apelantes, mucho menos para sostener que el foro primario incurriera en error manifiesto.

En lo concerniente al argumento sobre la presunta ausencia total de prueba sobre los daños continuados, basta con reiterar que, aunque la figura fue nombrada *daños continuados*, nuestro Tribunal Supremo ha sido enfático en que **lo que debe ser continuado es la *causa* del daño, mas no el daño en sí mismo**. De conformidad, valoramos que hay amplia prueba a los efectos de que el movimiento de la maquinaria del Estado en contra del señor Duarte Rosario dependía de la información recopilada y suministrada por las agentes-apelantes en etapas tempranas del proceso. Por lo tanto, si la investigación fue defectuosa desde un principio y esa información fue la base para la acción administrativa, que no cesó sino hasta el resultado final de la Resolución emitida por el Dpto. de Hacienda desestimando las multas emitidas, no cabe hablar de actos independientes, aislados o que no tenían "ninguna inherencia".

En suma, no identificamos prueba en el expediente que menoscabe las determinaciones del foro primario, menos aún, insistimos, apreciamos que este haya incurrido en prejuicio, pasión, parcialidad o error manifiesto al sopesar la prueba. Por el contrario, nos resulta evidente que el TPI examinó los testimonios ofrecidos por cada uno de los testigos cuyas voces escuchó, asignándole el valor probatorio que les merecieron, y del cual dejó clarísima constancia. Aunque resulte trillado, valga reconocer que el TPI tiene una posición aventajada sobre este foro intermedio al aquilatar la prueba testifical, por haber contado con la experiencia inigualable de observar los testigos cara a cara, teniendo la oportunidad de escudriñar su *demeanor* en el mismo instante en que respondían a los interrogatorios.

En lo referente al señalamiento de error que cuestiona la metodología utilizada por el tribunal *a quo* para determinar las cuantías en concepto de

indemnización, acentuamos que dicho foro basó su análisis, principalmente, en la prueba desfilada durante el juicio en su fondo. En segundo lugar, al no encontrar precedentes jurisprudenciales con una situación fáctica similar al caso ante nos para determinar la reparación del daño, consideró como referente la compensación concedida en *Berríos v. International General Electric*, 88 DPR 109 (1963), sobre persecución maliciosa para, detalladas las circunstancias particulares que le llevaron a justificar la indemnización concedida, ajustarla a su valor presente. No observamos error en la metodología ni en el cómputo efectuados.

Resulta oportuno aquí enfatizar que los tribunales revisores únicamente debemos intervenir con las indemnizaciones por daños concedidas cuando, al tomar en cuenta cuantías adjudicadas en casos similares previos, actualizadas al momento de la sentencia, la indemnización concedida se desvíe manifiestamente de lo que sería una indemnización razonable. Ello, por considerarla "ridículamente baja o exageradamente alta". De este modo, no consideramos que nos encontremos ante el supuesto de la adjudicación de una cuantía por daños exageradamente alta, como argumentaron los peticionarios.

c.

Como próximo señalamiento de error alzado, las agentes-apelantes arguyen que les aplica la doctrina de inmunidad condicionada, en consecuencia, no resultan personalmente responsables por los actos que se le imputaron.

Iniciamos la discusión de este asunto atendiendo las conductas de la señora Nieves González que el TPI encontró probadas. Nos referimos, en específico, a aquellas expresiones y actos que dicha apelante dirigió en contra del señor Duarte Rosario por razón de su nacionalidad, y que ya no nos resulta necesario reproducir. Sin mayores rodeos, juzgamos que tales actos y expresiones, (el foro apelado le concedió entera credibilidad al testimonio del señor Duarte Rosario al narrar la conducta que mostró la

señora Nieves González hacia él), no encuentran cobijo bajo la doctrina de la inmunidad condicionada, por lo que esta debe responder en su carácter personal a la causa de acción presentada en su contra. En este sentido, valoramos que las expresiones y actos aludidos establecieron sin mayor dificultad que la apelante no actuó de buena fe, procediendo irrazonablemente, conociendo que su conducta era ilegal, *Acevedo v. Srio. Servicios Sociales*, supra, pág. 262., habiendo desplegado más bien una actuación maliciosa hacia el señor Duarte Rosario. *In re Colton Fontán*, supra.

Dicho lo anterior, sin embargo, es necesario clarificar que tampoco cabe eximir de responsabilidad al ELA por tales actuaciones intencionales de la señora Nieves González. Según ya hemos citado de *Leyva et al v. Aristud et al*, supra, págs. 510-511, nuestro Tribunal Supremo indicó que el ELA está sujeto a responsabilidad en cualquiera de los supuestos siguientes: (1) cuando el empleado, agente o funcionario **causa un daño por su exclusiva culpa o negligencia, mientras desempeña sus funciones y actúa en su capacidad oficial**; (2) cuando el empleado, agente o funcionario causa un daño mientras desempeña sus funciones y actúa en su capacidad oficial por una actuación preponderantemente negligente aun cuando dicha conducta tenga algunos elementos intencionales; (3) **cuando, a pesar de que el daño fue directamente producido por un acto enteramente intencional de los cuales no responde el Estado, hubo otros actos negligentes separados de cocausantes del daño por los cuales sí debe responder el Estado** y, (4) cuando el Estado a través de sus agentes es negligente por omisión al incumplir con un deber impuesto por las leyes y la Constitución. (Énfasis provisto). Juzgamos que aquí se cumplen a plenitud los presupuestos enumerados.

Las determinaciones de hechos alcanzadas por el TPI establecieron un claro *nexo* entre las actuaciones intencionales de la señora Nieves

González, **y el ejercicio de sus facultades fiscalizadoras como empleada del Dpto. de Hacienda**, al inquirir por el cumplimiento del pago del IVU que dio lugar a la eventual expedición de sendas multas y el proceso administrativo producto de tal intervención. *Leyva et al v. Aristud et al*, supra, pág. 512. Nótese que la primera intervención de la señora Nieves González con el apelado, luego de comprar el *hot dog* y refresco, fue la de inquirirle al señor Duarte Rosario si estaba cobrando el IVU-LOTO, actividad dentro de las funciones que le correspondía asumir como empleada del Dpto. de Hacienda. Las demás interacciones de dicha apelada con el apelado, según plasmadas en las determinaciones de hechos de la *Sentencia*, siguieron enmarcadas en el ejercicio de tales funciones, aunque de la manera perversamente intencionada que integró las notas discriminatorias ya reseñadas. En este sentido, conceptualmente no podemos separar la autoridad con la que actuó la señora Nieves González como empleada del Dpto. de Hacienda desde el inicio de su malsana interacción con el apelado, y la actuación negligente del resto del personal que intervino a partir de tales actos, emitiendo las multas y dilatando el injusto proceso administrativo *ad nauseam*.

Sin embargo, es distinta la conclusión a la que llegamos al examinar las conclusiones que estampó el foro primario en su *Sentencia* al considerar la responsabilidad personal atribuible a la señora Nieves Franco. En lo puntual, no logramos conciliar la siguiente expresión del TPI en su Sentencia; *no hubiese podido concluir que dicha codemandada conscientemente hubiese sido parte del patrón discriminatorio iniciado intencionalmente por Nieves González*[16], con su determinación de imponerle responsabilidad personal por unos hechos discriminatorios del cual no pudo concluir fueran cometidos de manera intencional. Aunque, tal como dicho foro, sí observamos negligencia en el descargo de las facultades de la

---

[16] Ver, último párrafo de la página 21 de la *Sentencia*.

señora Nieves Franco como empleada del Dpto. de Hacienda, cuando intervino con el apelado, (al no leerle o informarle sobre los derechos del contribuyente, y tampoco permitirle mostrar la evidencia que tenía sobre las diligencias realizadas para solucionar el problema del terminal dañado y así evitar le expedición de las multas, con el proceso administrativo que le siguió), esto, de suyo, no supera el grado de intencionalidad que le prive del beneficio de la inmunidad condicionada.

La fuente de la inmunidad condicionada de la señora Nieves Franco dimana de la *Ley de Reclamaciones y Demandas contra el Estado*, Ley Núm. 104, *supra*, cuyo inciso (a) del Art. 2, 32 LPRA sec. 3077, dispone lo siguiente:

> (a) Acciones por daños y perjuicios a la persona o a la propiedad hasta la suma de setenta y cinco mil (75,000.00) dólares causados por acción u omisión de **cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo interviniendo culpa o negligencia.** (Énfasis provisto).

Sobre ello, en *García v. ELA*, supra, pág. 820, nuestro alto foro manifestó que, cuando se le reconoce inmunidad a un funcionario público en el desempeño de sus deberes oficiales por la responsabilidad civil que pueda generar su conducta, *ésta es separada y distinta de la del Estado.* Bajo ese supuesto, *el efecto es que sólo se puede demandar al Estado por la responsabilidad de éste, condicionado a las disposiciones de la Ley Núm. 104, ante. Íd.* (Énfasis provisto). A esos efectos, en *Vázquez Negrón v. ELA*, 113 DPR 148, 151 (1982), nuestro Tribunal Supremo resolvió que:

> [e]n estas circunstancias el Gobierno ha asumido toda la responsabilidad que generen los actos culposos o negligentes de estos empleados, **librándolos de este modo de todas las vicisitudes que supone una reclamación civil por daños en su contra y ha dispuesto como remedio exclusivo del perjudicado la acción en daños contra el Estado.**

> En estos casos el único remedio que tiene el perjudicado es la acción en daños y perjuicios **en contra del Estado** dado el hecho de que cuando se le concede inmunidad a un funcionario público hay una inexistencia de causa de acción

en contra de éste. (Énfasis provisto). *Lind Rodríguez v. E.L.A.*, 112 D.P.R. 67 (1982). *Íd.*, págs. 820-821. *García v. ELA*, supra.

Por lo explicado, procede modificar la *Sentencia* apelada en términos de la responsabilidad personal impuesta a la señora Nieves Franco, pues se encuentra cobijada por la inmunidad condicionada, siendo el Estado quien está sujeto a responder por los actos negligentes de esta.

d.

Finalmente, se cuestiona la imposición de honorarios de abogados al Gobierno. Según ya precisamos, el foro primario le ordenó a la parte apelante a pagar solidariamente la suma de cinco mil dólares ($5,000) en concepto de honorarios de abogados.

Sobre tal determinación iniciamos por señalar que, aun cuando en el dictamen aludido se citó el derecho aplicable a la imposición de honorarios de abogados, no se explicó en qué consistió la temeridad que justificó la imposición de honorarios de abogados. Advertimos lo anterior, aun reconociendo que, *en ausencia de una conclusión expresa a esos efectos,* ***un pronunciamiento en la sentencia condenando al pago de honorarios de abogado, implica que el tribunal sentenciador consideró temeraria a la parte así condenada.*** (Énfasis provisto). *Montañez Cruz v. Metropolitan Cons. Corp.*, 87 DPR 38, (1962).

Entonces, al verificar el tracto procesal del caso, junto a la *Sentencia* emitida, no podemos coincidir con el juicio del tribunal *a quo* al imponer temeridad. Es decir, no logramos observar en ninguna de las etapas del proceso la *terquedad, obstinación, contumacia e insistencia desprovista de fundamentos* en el litigio que justificaran tal sanción. Por una parte, aunque el TPI aludió a determinaciones previas de este Tribunal de Apelaciones como fundamento para sustentar algún segmento de su razonamiento, lo cierto es que no expedimos ninguno de los recursos de *certiorari* presentados por el Gobierno, por lo que no podían calificarse

como *ley del caso*, a pesar de las expresiones que contuvieran[17]. En consecuencia, las controversias de derecho levantadas durante el juicio permanecían muy vivas y correspondían ser dirimidas en este, junto a las demás consideraciones fácticas que también resultaron dirimidas.

Como ejemplo de lo aseverado, la determinación sobre cuándo inició el término para que el apelado presentara su causa de acción se alimentó del establecimiento de los hechos acontecidos, para entonces estar en posición de aplicar la casi *ininteligible[18]* doctrina sobre los daños continuos o sucesivos. Además, resulta del todo dable reconocer como razonable que el Gobierno tuviera la oportunidad de confrontar en el juicio la versión de los hechos que promovían las apeladas, con las declaraciones en sala que hiciera el señor Duarte Rosario, y entonces así poner en verdadera posición al Tribunal de dirimir una prueba que dependía tanto de la credibilidad que se le asignara a uno o el otro testigo.

En definitiva, no observamos en la conducta de los apelantes durante el proceso conducido las características que justifican la imposición de temeridad.

Como punto final, también cabe rectificar que la *Sentencia* contra el Estado **no** puede incluir el pago de intereses por período alguno anterior a esta, por disposición expresa del Art. 8 de la Ley Núm., 32 LPRA sec. 3083.

## IV. Parte dispositiva

Por los fundamentos antes mencionados, y de conformidad con los fundamentos expuestos, que integramos a esta parte dispositiva,

---

[17] La denegatoria del *certiorari* **no** implica posición alguna de este Tribunal de Apelaciones respecto a los méritos de la causa sobre la cual trata el recurso. Esto es, una resolución declarando No Ha Lugar un recurso de *certiorari* **no resuelve implícitamente cuestión alguna contra la peticionaria a los efectos que pueda señalarse como cosa juzgada**. La resolución denegatoria simplemente es índice de la facultad discrecional de este Tribunal para negarse a revisar en determinado momento. *Sociedad Legal de Gananciales v. Pauneto Rivera*, 130 DPR 749, 755-756 (1992).

[18] Baste como muestra de la complejidad que exhibe la aplicación de la doctrina de los daños continuados *vis a vis* los daños sucesivos la expresión de nuestro Tribunal Supremo en *Rivera Ruiz v. Mun. de Ponce*, supra, pág. 418, en términos de que "nuestros pronunciamientos previos sobre este asunto, particularmente en lo referente a los llamados daños continuados, **han sido imprecisos, pues hemos aplicado normas contradictorias entre sí. Eso ha llevado a una confusión doctrinal**". (Énfasis provisto).

ordenamos modificar la *Sentencia* apelada a los fines de: 1) revocar la determinación sobre imposición de gastos y honorarios de abogado a la parte apelada; 2) revocar la imposición de responsabilidad personal a la apelante- Nieves Franco; 3) revocar la *Orden* sobre el pago de intereses por el Estado por el periodo anterior a que fuera emitida la *Sentencia*. Así, una vez modificada, se *Confirma* la **Sentencia** apelada en todos los demás términos que no resulten contrarios a lo aquí explicado y ordenado.

Lo pronunció y manda el Tribunal y lo certifica su Secretaria.

La Jueza Aldebol Mora, concurre sin voto escrito.

La Jueza Grana Martínez, disiente sin voto escrito.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones